UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAGS II, LLC and G2BK, LLC,

       Plaintiffs,

                                   File No. 1:13-cv-393

v.

                                   HON. ROBERT HOLMES BELL

HUNTINGTON NATIONAL BANK, NA,
and FOURTEEN CORPORATION,

       Defendants.

_____/

# O P I N I O N

This matter is before the Court following a four-day bench trial that began on July 11, 2016.

## I. Background

In January 2012, Baker Lofts, LLC, a limited liability company that was formed by Scott Bosgraaf to purchase the previously abandoned Baker Lofts Furniture Company building (the "Baker Building") in Holland, Michigan, filed for bankruptcy. Plaintiff DAGS II, LLC, a single-member limited liability company formed by Suzanne Bosgraaf, is the assignee of claims on behalf of Baker Lofts in this matter. Plaintiff G2BK, LLC was in possession of a liquor license formerly owned by Baker Lofts.

The Baker Building was renovated to become a mixed-use building consisting of condominiums and commercial space. Defendant Huntington National Bank, NA, provided

Baker Lofts with several loans that were used to finance the renovations. As collateral for those loans, Huntington received security interests in property controlled by Baker Lofts. Relevant to this case, the security interests included: two mortgages on the Baker Building (the "2004 Mortgage" and the "2005 Mortgage"); proceeds from a Brownfield Reimbursement Agreement (the "Brownfield TIF") between Baker Lofts and the City of Holland, which provided tax-increment-financing reimbursement payments for a set number of years following the completion of the renovations; rental income from persons and businesses living in and using the Baker Building; and a liquor license.

Prior to filing for bankruptcy, Baker Lofts defaulted on payments due to Huntington. Following the default, Huntington took several steps in an attempt to satisfy the debt it believes it was owed. On May 9, 2011, Huntington assigned to Defendant Fourteen, a wholly-owned subsidiary of Huntington, "all right, title and interest . . . in, to and under [the 2005 Mortgage] and debt due thereunder made by Baker Lofts, LLC[.]" (Assignment of Mortgage, Trial Ex. I.) Huntington retained its interest in the 2004 Mortgage. After Huntington also assigned Fourteen "an undetermined . . . amount of debt" owed to Huntington by Baker Lofts, Fourteen initiated foreclosure proceedings on the 2005 Mortgage on June 9, 2011. (Notice of Foreclosure, Trial Ex. 23; Tr. II at 337.)[1] The notice of foreclosure stated that "the balance owing on the Mortgage is $5,254,435.04," and it did not

---

[1] Citations to the transcripts will be referred to as follows:
- July 11, 2016 Transcript (ECF No. 135) = Tr. I.
- July 12, 2016 Transcript (ECF No. 136) = Tr. II.
- July 13, 2016 Transcript (ECF No. 137) = Tr. III.
- July 14, 2016 Transcript (ECF No. 138) = Tr. IV.

mention the 2004 Mortgage. Fourteen Corporation was the only bidder at the sheriff's sale, and purchased the property with a credit bid of $1,856,435.04. (Sheriff's Deed, Trial Ex. 27.) Following the sheriff's sale, Huntington released its interest in the 2004 Mortgage at no cost to Fourteen. Fourteen subsequently sold the Baker Building to G.R. Developments, LLC for $2,355,000, and paid the proceeds from that sale to Huntington as a dividend.

After purchasing, and subsequently selling, the Baker Building, Huntington believed it was still owed roughly $3,300,000, and took efforts to collect on the remaining collateral. A public sale was held, and Huntington purchased the Brownfield TIF rights with a credit bid of $1,107,000. (Notification of Public Disposition of Collateral, Trial Ex. DD.) Huntington also collected on rents due to Baker Lofts, and executed an agreement requiring G2BK to assign its interest in the liquor license back to Huntington.

The parties dispute whether, following the sheriff's sale on June 9, 2011, Baker Lofts was still indebted to Huntington. Plaintiffs argue that any remaining debt owed to Huntington was extinguished at the sheriff's sale, and that Huntington improperly attempted to collect on the liquor license, the Brownfield TIF, and the assignment of rents. Plaintiffs' amended complaint thus seeks a declaration that Baker Lofts was no longer indebted to Huntington or Fourteen and that the collateral was unenforceable, and raises claims of conversion as to the Brownfield TIF (Am. Compl. ¶ 86, ECF No. 56) and the assignment of rents (*id.* ¶ 91), a claim of "replevin/claim of delivery" seeking to regain its interest in the Brownfield TIF (*id.* ¶ 97), a claim arguing that Huntington tortiously interfered with the Brownfield TIF

3

agreement between Baker Lofts and the City of Holland (*id.* ¶ 103), and a claim arguing that Huntington violated Article 9 of Michigan's Uniform Commercial Code by selling the Brownfield TIF when Baker Lofts was neither indebted to Huntington nor in default (*id.* ¶ 111). Huntington has argued that Plaintiffs' claims are barred by the doctrine of unclean hands (Answer to Am. Compl. 35, ECF No. 60), and has raised a counterclaim arguing that it is entitled to the proceeds from G2BK's recent sale of the liquor license.[2]

Plaintiffs' claims all hinge on the same finding: if Baker Lofts was no longer indebted to Huntington following the sheriff's sale, then Huntington's action of collecting on debt that did not exist was wrongful. But if, as Huntington asserts, it was still owed over $3 million, then under the security agreements, Huntington could rightfully foreclose on the Brownfield TIF, the rental income, and the liquor license, and Plaintiffs' claims alleging otherwise are meritless.

## II. Legal Framework

"In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a). The Court begins with the legal framework it has applied to determine whether Baker Lofts was still indebted to Huntington following the sheriff's sale.

### A. Mich. Comp. Laws § 600.3280

Michigan law provides:

---

[2] Huntington's counterclaim was initially broader. At trial, Plaintiffs moved for a directed verdict on the counterclaim, and Defendants objected only insofar as the counterclaim related to the liquor license. The Court issued a directed verdict on the counterclaim, except as the claim related to the liquor license. (Trial Tr. IV at 661-62.)

> When, in the foreclosure of a mortgage by advertisement, . . . the mortgagee . . . has become or becomes the purchaser, . . . and thereafter such mortgagee . . . shall sue for and undertake to recover a deficiency judgment against the mortgagor, . . . it shall be competent and lawful for the defendant against whom such deficiency judgment is sought to allege and show as matter of defense and set-off to the extent only of the plaintiff's claim, that the property sold was fairly worth the amount of the debt secured by it at the time and place of sale *or that the amount bid was substantially less than its true value*, and such showing shall constitute a defense to such action and shall defeat the deficiency judgment against him, either in whole or in part to such extent.

Mich. Comp. Laws § 600.3280 (emphasis added). This statute only applies, however, at foreclosure sales involving "one note and one mortgage." *See Bd. of Trs. of Gen. Ret. Sys. of City of Detroit v. Ren-Cen Indoor Tennis & Racquet Club*, 377 N.W.2d 432, 433-34 (Mich. Ct. App. 1985). In other words, when there is one note and one mortgage, and the mortgagee purchases the property at a sheriff's sale with a bid that is substantially less than the true value of the property, the mortgagor has a defense against deficiency judgment claims raised against it.

### B. *Ren-Cen* Extends Mich. Comp. Laws § 600.3280

In *Ren-Cen*, the Michigan Court of Appeals extended the principles underlying Mich. Comp. Laws § 600.3280 to a factual situation similar to the one at hand—where there was more than one note and one mortgage. There, the same plaintiff loaned the defendant money on two separate occasions and, in return, received promissory notes secured by two separate mortgages (the "junior" and the "senior" mortgage) on the same property. *Ren-Cen*, 377 N.W.2d at 433. A foreclosure sale was held on the junior mortgage, at which time the

5

plaintiff purchased the junior mortgage while maintaining its interest in the senior mortgage. *Id.*

The Michigan Court of Appeals was concerned that the plaintiff would be able to collect a "double recovery" or "windfall." *Id.* at 436. The plaintiff would have been able to "obtain the price advantage of purchasing at a second mortgage sale without the disadvantage of having to satisfy the debt secured by the first mortgage in order to obtain uninterrupted enjoyment of the property." *Id.* at 436. Thus, the court stated:

> If the holder of both a junior and senior mortgage forecloses the junior and buys it on foreclosure sale it is generally held that, in the absence of an agreement to the contrary, the mortgagor's personal liability for the debt secured by the first mortgage is extinguished.

*Id.* at 434. Importantly, the Michigan Court of Appeals has limited *Ren-Cen*'s application to cases where the value of the property received by the mortgagee is greater than the amount of debt owed to it. *See Fed Deposit Ins. Co. v. Torres*, No. 311277, 2014 WL 309787, at *8 (Mich. Ct. App. Jan. 28, 2014); *see also DAGS II v. Huntington Nat'l Bank, NA*, 616 F. App'x 830, 840-41 (6th Cir. 2015).

Accordingly, *Ren-Cen* and *Torres* stand for the proposition that, even when there is more than one note and one mortgage on the property, when the same mortgagee holds both the junior and senior mortgage, and purchases the junior mortgage at the foreclosure sale, the mortgagor's personal liability for the debt secured by the senior mortgage is extinguished so

6

long as the value[3] of the property it received was greater than the total amount of debt owed to it.

### C. This Court and the Sixth Circuit Extend *Ren-Cen*

This case has an added wrinkle. Whereas in *Ren-Cen*, the same plaintiff held both the junior and the senior mortgage, here, at the time of the foreclosure sale, Huntington held the senior mortgage, and Fourteen held the junior mortgage. Plaintiffs argued, however, that Huntington was effectively the holder of both the junior and the senior mortgage, and that Fourteen was merely acting in accordance with Huntington's wishes. (4/1/2014 Mot. Summ. J. 8, ECF No. 72.)

This Court's June 2014 opinion set out to determine whether *Ren-Cen* could apply despite the fact that both Huntington and Fourteen held separate mortgages on the property. The Court reasoned that if Fourteen was not acting independently—that is, if it was simply

---

[3]  The parties have expressed disagreement as to what value should be used for purposes of this analysis. Defendants have stated that the "restricted marketing period value" should be used because "this is a value that realistically can be obtained at a sheriff's sale." (Defs.' Pretrial Proposed Findings of Fact and Conclusions of Law 8, ECF No. 131.) In previous opinions, the Court has never explicitly answered this question. The Court has, however, declined to use Plaintiffs' proposed method of adding the purchase price of the Baker Building to the value of the 2004 Mortgage. (6/8/2016 Op. 9, ECF No. 125.)

The figure that the Court will use is, for lack of a better term, the fair sheriff's sale value. The crux of this case is whether Baker Lofts was still indebted to Huntington following the sheriff's sale. If a party, other than Huntington or Fourteen, had placed a bid at a fair sheriff's sale, then that bid amount is what would have been credited toward Baker Lofts' debt to determine whether Baker Lofts was, in fact, still indebted. *Ren-Cen* did not seek to require the mortgagee to place a higher bid than outside buyers at a sheriff's sale. Rather, it sought to prevent a "double recovery" or a "windfall" by the mortgagee obtaining a "price advantage." 377 N.W.2d at 436. If Defendants had placed a fair bid at a fair sheriff's sale, then there would be no risk of a "double recovery" or a "windfall," as they would not have obtained a "price advantage."

Each party has presented evidence as to what they believe the property would have sold for at a fair sheriff's sale. Indeed, Plaintiffs' acknowledged that "one of the primary tasks before [the Court] is to sort through the evidence and determine what price the Baker Property would have brought at the sheriff's sale but for Huntington's actions." (Pls.' Trial Br. 3, ECF No. 134.) That is what the Court will do.

7

Huntington's "alter ego"—then there is no reason that *Ren-Cen* should not apply. Thus, if Huntington and Fourteen are the legal "alter egos" of each other, then at the time of foreclosure, Huntington was effectively the holder of both the 2004 and 2005 Mortgages. And as the holder of both mortgages, under *Ren-Cen*, Plaintiffs' "personal liability for the debt secured by the first mortgage" would have been extinguished after the sheriff's sale if the value of the Baker Building exceeded the amount of debt owed to Huntington.

Under Michigan law, to determine whether two corporate entities may be treated as alter egos of each other, three elements must be proved: "'(1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss.'" *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 798 (6th Cir. 2007) (citing *Foodland Distribs. v. Al-Naimi*, 559 N.W.2d 379, 381 (Mich. Ct. App. 1996)).

This Court has previously determined that Fourteen was a mere instrumentality of Huntington. Prior to trial, the Court also held that questions of fact exist as to whether Fourteen was used to commit a wrong, and whether Plaintiffs suffered an unjust loss or injury as a result of that wrong.

### III. Issues Remaining

Following trial, several factual issues remain for the Court to decide, the most important being the value of the Baker Building at the time of the sheriff's sale, and the amount of indebtedness owed by Baker Lofts to Huntington at the time of the sheriff's sale.

Because the Court finds that the value of the Baker Building did not exceed the amount of indebtedness, *Ren-Cen* does not apply, and the Court need not determine whether Fourteen was used to commit a fraud or wrong, or whether Plaintiffs suffered an unjust loss.

### IV. Finding of Fact 1: The Value of the Baker Building

The value of the Baker Building is a central issue before this Court. Plaintiffs contend that "[t]he value of the Baker Property on July 28, 2011 was $10-$12 million," and that "[i]f Huntington had allowed a fair sheriff's sale to occur, the Baker Property would have sold for more than $5.5 million." (Pls.' Post-Trial Proposed Findings of Fact and Conclusions of Law 7, ECF No. 144.) Defendants, on the other hand, assert that the "true value of the Baker Lofts property[4] was between $1.8-$2.355 million." (Defs.' Post-Trial Findings of Fact and Conclusions of Law 23, ECF No. 143.) The value of "a property sold by foreclosure by advertisement" is a "factual matter[.]" *NPB Mortg., L.L.C. v. Golliday*, No. 301830, 2012 WL 516763, at *1 (Mich. Ct. App. Feb 16, 2012) (citing *Stewart v. Eaton*, 238 N.W. 651 (Mich. 1939)).

The parties have presented substantial evidence in support of their valuations. To begin, a summary of that evidence is helpful.

### A. Plaintiffs' Evidence

Plaintiffs argue that the best evidence of value is "what a buyer actually paid" at a "fair sheriff's sale," but because Huntington prevented a fair sheriff's sale from occurring,

---

[4] Defendants characterize the "true value" as the "restricted marketing period value because this is a value that realistically can be obtained at a sheriff's sale."

the best evidence of value is not available. (Pls.' Trial Br. 4.) Thus, they argue, the second best evidence of value is testimony from three real estate investors regarding what they would have paid for the Baker Property, but for Huntington's actions. (*Id.*) Plaintiffs' argue that the third best indicator of value is an appraiser's "*prediction* of what a buyer would have paid." (*Id.* (emphasis in original)).

### 1. Investor Testimony

At trial, the Court heard from three investors in the Holland area who were interested in purchasing the Baker Building.

#### a. Jeffrey Padnos

Jeffrey Padnos was the first to testify. Mr. Padnos is a self-described "passive investor" in real estate and the president of a family-owned business in the recycling industry. (Tr. I at 10, 30.) Prior to the sheriff's sale, Padnos and Scott Bosgraaf began to discuss an opportunity for Padnos to purchase the Baker Building, which was similar to property that Padnos already owned. (*Id.* at 17-19; Trial Ex. 19.) When Padnos was informed that the Baker Building was set to be sold at a sheriff's sale, he used three methods to arrive at a valuation for the property. The "income approach" was the "most significant" to him. (Tr. I at 20.) Under this approach, Padnos essentially determined the net income and multiplied that amount by a factor equal to the desired return on investment. (*Id.*) To determine the net income, he used a spreadsheet that included rent and income figures provided to him by Bosgraaf. (*Id.* at 36.) Using this approach, and the figures provided by Bosgraaf, Padnos

10

stated that he valued the property at "five to five and a half million" and that this was a value that he would not bid higher than. (*Id.* at 22.) Padnos never placed a bid at the sheriff's sale because Bosgraaf informed him that there was a first mortgage on the property. (*Id.* at 25.) Padnos never personally inquired about the first mortgage, but relied on Bosgraaf and Ben Irwin to do so. (*Id.*) He did not make an effort to determine how much debt was secured by either the first or second mortgage, and never read the foreclosure notice. (*Id.* at 34.)

After the sheriff's sale occurred, Padnos again became interested in purchasing the property during the redemption period. He asked Ben Irwin to attend a meeting at the Bankruptcy Court in Grand Rapids "to attempt to work out a deal with Huntington to redeem the property." (*Id.* at 27.) Padnos made an offer of "roughly $3.38 million" for the Baker Building, the Brownfield TIF, and other personal property combined. This bid valued the Baker Building itself at "a little over" $1.8 million, because he believed that during the redemption period, Huntington was only entitled to receive the amount that they bid at the sheriff's sale. (*Id.* at 29; Trial Ex. EE.) He did not receive any counteroffers or "countercommunication" from Huntington after making this bid (Tr. I at 29), but he never made any effort to follow up with Huntington either (*id.* at 38).

### b. Daniel Dykgraaf

The Court next heard from Daniel Dykgraaf, who is in the real estate developing business. Prior to the date of the sheriff's sale, Dykgraaf met with Scott Bosgraaf about the Baker Building. He received information from Bosgraaf regarding the "income and

expenses," the structure of the roof, and the "building itself." (*Id.* at 46.) He did not receive copies of the individual leases, but rather received a "summary." (*Id.*) Based on this information, Dykgraaf valued the property at "ten to twelve million dollars," and he stated that he was willing to bid "up to about six million." (*Id.* at 48.) Dykgraaf did not place a bid at the sheriff's sale because Defendants were "auctioning it off on the second mortgage, I believe, subject to the first mortgage, and I just didn't feel comfortable with that." (*Id.*) Dykgraaf had Robb Wardrop, an attorney in Grand Rapids, contact the bank to determine how much debt was owed on the first mortgage, but Wardrop did not receive an answer. (*Id.* at 48-49.)

After the sheriff's sale, on February 13, 2012, Dykgraaf made an offer that included a $1,881,250 bid for the Baker Building, and a $731,000 bid for the Brownfield TIF. (Trial Ex. T.) This offer was conditioned on receiving the title free and clear of the 2004 Mortgage. (Tr. I at 57.) He sent another offer letter on March 7, 2012, offering to purchase the Baker Building, the Brownfield TIF, and assignments of all collateral for $2.45 million. (Trial Ex. Y.) He received no counteroffer or communication from Huntington. (*Id.*) Dykgraaf, like Padnos, did not follow up after receiving no response to the offer. (*Id.* at 61.)

### c. Jonathan Rooks

Plaintiffs also called Jonathan Lee Rooks, the owner of a "real estate investment and development entity" firm. (Tr. II at 192.) Rooks had previously toured the Baker Building and learned through the media that it might be available for purchase. He attempted to place

12

a value on the Baker Building by comparing it to a similar property that he owned in Grand Rapids, and discounting that amount due to the lower property values in Holland. (*Id.* at 197.) Applying that discount rate, he believed the property was worth about $5,525,000 (*id.* at 199), but he never completed the due diligence required to feel comfortable actually making a formal offer in that amount (*id.* at 210). He never did any title work on the property, but discovered the senior mortgage either through Bosgraaf or "through the grapevine." (*Id.* at 200.)

After the sheriff's sale, Rooks again became interested in the property, but stated that he needed to "go see the property and tour the property" with Dan Yeomans, who worked for the bankruptcy court's appointed receiver. (*Id.* at 201.) Yeomans canceled several meetings because "he said there was another buyer and it looked like it was going to be—it was a done deal." (*Id.*) After Rooks was informed there was another potential buyer, "that was enough information . . . to say I'll go look at other deals because there were a lot of deals out there." (*Id.* at 202.) He never made an offer or determined a definitive figure that he was willing to pay for the property following the sheriff's sale. (*Id.* at 206-07.) Rooks never conducted due diligence such as "environmental studies, asbestos studies, radon gas studies, all that stuff." (*Id.* at 203.) Admittedly, he "didn't really work on this project very hard." (*Id.* at 207.)

13

### 2. Appraiser Testimony

Plaintiffs called Todd Schaal as an expert witness to opine on the value of the Baker Building. Mr. Schaal has a degree from a junior college, a real estate license, is a Certified Commercial Investment Member (CCIM), and has a Graduate of Realtors Institute (GRI) designation as well as an appraisal license. (Tr. I at 62-64.) Schaal was asked to determine the market value[5] of the property as of July 28, 2011. (Trial Ex. 1 at 4.) He was asked to appraise the property using a rent roll given to him by Robb Wardrop. (Tr. I at 70.) He also used information that he had discovered while appraising the property for Huntington on prior occasions. (Tr. I at 69.) He conducted market comparisons on rental rates, lease arrangements, capitalization rates, and market expenses, and referred to national periodicals when assessing the expenses per square foot. (*Id.*)

Importantly, Schaal used the direct capitalization method's income approach to determine the value of the property. (*Id.* at 72.) He stated that he used this approach, rather than a discounted cash flow approach (DCF), because the DCF approach involves many more variables and assumptions, which he stated could easily be manipulated. (*Id.* at 84, 85.) The direct capitalization approach allowed him to, essentially, take a "snapshot" of the property as of July 28, 2011, and using that snapshot, project out into the future assuming that the figures and variables would remain constant. He determined the net operating income by starting with the "gross rents," subtracting "vacancy and credit loss," and subtracting

---

[5] Schaal, citing the Federal Register, defined market value as: "The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus." (Trial Ex. 1 at 2.)

"expenses." (*Id.* at 73.) After arriving at this figure, and applying the capitalization rate, he valued the residential portion of the Baker Building at $2,150,000 and the commercial space at $2,950,000, for a total value of $5,100,000. (Trial Ex. 1 at Report Summary.)

## B. Defendants' Evidence

Defendants introduced substantial evidence that the value of the Baker Building was less than the amount of indebtedness and, thus, that *Ren-Cen* is inapplicable. Defendants would agree that the most accurate value of the Baker Building in July 2011 would be the amount that was collected at a fair sheriff's sale. Defendants also presented evidence of the amount the property was sold for following the expiration of the redemption period, as well as testimony from their own expert witness.

### 1. The Sheriff's Sale

On July 28, 2011, Fourteen Corporation purchased the Baker Building at the sheriff's sale for just over $1.8 million. Defendants contend that a fair sheriff's sale occurred, and that the amount bid was an accurate representation of the property's value. Accordingly, Defendants argue, the best evidence of the Baker Building's value supports a finding that the property was worth $1.8 million.

Matthew Wilk, the Huntington loan officer in charge of the Baker Building at the time of the sheriff's sale, testified regarding the foreclosure process. He stated that prior to the sheriff's sale, Huntington assigned the 2005 mortgage to Fourteen Corporation. (Tr. II at 336; Trial Ex. I.) Huntington assigned an "undetermined" amount of debt to Fourteen that would

15

be "equal to the bid at the foreclosure when that was determined[.]" (Tr. II at 337.) The amount of debt assigned to Fourteen was determined at the time of the sheriff's sale. (*Id.*) Wilk stated that Huntington was "indifferent" as to whether the foreclosure occurred on the 2004 or 2005 mortgage, and that the decision to foreclose on the 2005 mortgage was made by outside counsel. (*Id.* at 338.)

Huntington's outside counsel informed the Bosgraafs of the sheriff's sale. (*Id.* at 339; Trial Ex. 24.) The notice of foreclosure, which was also made publicly available, noted that the balance owing on the 2005 mortgage was $5,254,434.04, and that this balance was the sum of the debt owed on Loans 133, 141, and 158. (Trial Ex. 24.) The notice of foreclosure did not mention the fact that the Baker Building was encumbered by a senior mortgage. Wilk stated that he was never contacted about the senior mortgage. (Tr. II at 340.) He testified, essentially, that the other mortgage was irrelevant. There was $5.25 million in debt total; if someone had paid that amount, they would have received title free and clear of the senior mortgage. (*Id.* at 341-42.)

Wilk stated that Huntington did not believe the Baker Building was worth anywhere near $5.25 million, and that it followed a "very particular process" when determining how much to bid. The first thing that Huntington did was to obtain an appraisal of the property. Wilk said that Huntington was not allowed to rely on anything other than an appraisal when determining its bid amount. (*Id.* at 345.)With foreclosures, Huntington generally looked to the "liquidation value," or what it could receive if it sold the property within 90 days, because

16

it is "not in the business of owning real estate . . . We wanted to sell it right away." (*Id.* at 344.)

Interestingly, Todd Schaal, Plaintiffs' expert in this case, performed the original appraisal for Huntington. Schaal and his fellow employee, Scott Lee, first created an appraisal report in November 2010, using the DCF method rather than the direct capitalization approach. (Trial Ex. G.) An updated appraisal was completed in May 2011.[6] (Trial Ex. H.) In this report, Schaal found that the "revised liquidation value" was $1,900,000 for the commercial/office space and 32 apartment units, and $2,300,000 for the commercial/office space and 32 apartment units "in the combined unit sellout and apartment rental." (*Id.* at 6.) He stated that there was a "restricted market period value" of $2,200,000 for the commercial/office space and 32 apartment units, and $2,600,000 for the commercial/office space and 32 units in the "combined unit sellout and apartment rental." (*Id.*) On July 15, 2011, Floyd Merritt, also of Huntington Bank, sent Wilk an email stating that Huntington "will be using the 'Restricted Market Period Values'" and that "based on this appraisal the value should be $2.2 MM for a sale of the real estate to a single user in a 12 month marketing period." (Trial Ex. K.)

Wilk stated that Huntington subsequently learned that there were only 30 available apartment units, rather than 32. (Tr. II at 353.) Rather than foreclose on two occupied properties, Huntington chose to exclude those units from the sale and, thus, reduced its

---

[6] The updated appraisal report contained "two differences. The number of units was clarified and there was a hypothetical condition that a couple owner-occupied units would become vacant." (Tr. III at 574.)

17

appraisal value from $2.2 million to $1.8 million. (*Id.*) Wilk stated that no one at Huntington or Fourteen ever told outside counsel that they wanted to bid in excess of $1,856,250. (*Id.* at 362.) Fourteen placed a bid of $1,856,250 at the foreclosure sale and purchased the property. There were no other bidders, but Wilk stated that Huntington would have discharged the senior mortgage if any other bidder had placed a bid of $1,856,250. (*Id.* at 365.)

### 2. Sale of the Baker Building to G.R. Developments, L.L.C.

After the sheriff's sale occurred, the Baker Building came into John Schandevel's, a Vice President of both Huntington and Fourteen, portfolio. (Tr. III at 546.) His assignment was to manage the property and sell it to a third party. He stated that Fourteen's goal was to sell the property "free and clear" of the senior mortgage. (*Id.* at 549.)

Schandevel stated that Fourteen received several offers for the property following the sheriff's sale. On February 13, 2012, New Co., LLC, an entity owned by Dykgraaf, made an offer of $1,881,250 for the Baker Building and $731,000 for the Brownfield TIF. (*Id.* at 551; Trial Ex. T.) On February 24, 2012, Space Source, Inc., another entity of Dan Dykgraaf, submitted an identical offer, this time including an extra $25,000 for the liquor license and other personal property that Defendants maintained an interest in. (Tr. III at 552; Trial Ex. V.) On March 7, 2012, an offer of $2,103,159.59 for the Baker Building and $350,000 for "other assets" was made by Space Source. (Trial Ex. Y.) On April 16, 2012, Ben Irwin, a manager for Jeff Padnos's business, submitted an offer of $3,386,950, for the Baker

Building, "all personal property," "all liquor licenses," and "all TIFs" combined. (Tr. III at 553; Trial Ex. EE.) Schandevel stated that he responded to Irwin, but they did not negotiate. (Tr. III at 554.)

On April 18, 2012, a real estate purchase agreement was entered into between Fourteen and G.R. Developments, L.L.C., which was an entity formed by Jay Carll. (*Id.* at 554; Trial Ex. FF.) The Baker Building was sold for $2,355,000 (*id.* at 1), and the parties concurrently entered into an agreement to sell the Brownfield TIF (*id.* at 10) for $1,230,000 (Trial Ex. GG). The price Huntington received from G.R. Developments, L.L.C.—a total of $3,585,000—was greater than any other offer made.

### 3. Appraiser Testimony

Defendants also called Jeffrey Glen Genzink as an expert witness. He has owned a commercial real estate appraisal business since 2001 and has worked as an appraiser since 1990. He has a bachelors degree, holds a MAI Appraisal Institute Designation, and is a certified real estate appraiser. (Tr. III at 488.) He was asked to determine the "market value" of the Baker Building as of July 28, 2011, and was not given any restriction regarding valuation methodology. Genzink determined that the May 2011 appraisal report completed by Schaal and Lee was "a reasonable method for determining 'liquidation' and 'restricted marketing period values'" because that report surveyed active participants, at that time, to determine "what percentage of a discount rate would be required for determining liquidation and restricted market periods." (*Id.* at 496.) Because he found the 2011 report was more

reliable, he did not independently determine the liquidation values or the restricted market period values. He stated that it would be "disingenuous" to "contact people to make them think about what was going on in 2011," when they had provided the same information at that time.

In arriving at his conclusions, he looked to public records, rent rolls, the individual leases, national publications, and more. He also conducted an interior and exterior inspection of the building. (*Id.* at 494.) Genzink used the income approach's DCF analysis rather than the income approach's direct capitalization method. (*Id.* at 497.) He stated that he did this because the DCF method is best when the property is not stabilized, and the Baker Building's expenses were "going to change drastically" in the years following 2011. (*Id.* at 497-98.) Moreover, as of July 2011, it was known that a large commercial tenant would be moving out, and that another large tenant's lease was expired. (*Id.* at 498.) He stated that with known changes to income and expenses, it made little sense to use the direct capitalization method. He also looked at the individual leases and determined that there were some above-market and some below-market leases. For those below-market leases, he moved the rental rate up to the market value, and for the above-market leases, he "allowed that contract to go through the term of the lease, and then at the end of that term they would go to the market rate." (*Id.* at 507.)

Ultimately, Genzink concluded that the market value[7] of the Baker Building was $3,080,000. While he did not independently determine the restricted marketing period value

---

[7] Genzink also adopted the Federal Register's valuation of market value.

or the liquidation value, as noted, he found that the approach used by Schaal and Scott Lee in their initial appraisals in 2010 and 2011, was reasonable. (Trial Ex. MM at 14.)

## C. Findings of Fact

### 1. The sale of the property to G.R. Developments, L.L.C. resulted from a fair process.

This Court agrees with both Plaintiffs and Defendants that the best measure of the Baker Building's value is the price that would have resulted from a fair sheriff's sale. The Court finds that the sale of the Baker Building from Fourteen Corporation to G.R. Developments, L.L.C. reflects that number and, thus, that the value of the Baker Building as of July 28, 2011, was $2,355,000.

Although Defendants have argued that Fourteen's prevailing bid at the sheriff's sale—$1,856,250—reflects the value of the Baker Building, the Court is hesitant to say that this bid resulted from a *fair* sheriff's sale. Defendants had an incentive to create an unfair playing field and to allow Fourteen to purchase the Baker Building for a low figure, only to turn around and sell it to a third party for a higher figure, and there is evidence suggesting that that is what occurred.

As mentioned above, prior to the sheriff's sale, Huntington transferred an undetermined amount of Baker Lofts' debt to Fourteen in order to allow Fourteen to place a bid at the sheriff's sale. The notice of foreclosure did not mention that a senior mortgage existed on the Baker Building, but stated that "the balance owing on the Mortgage is $5,254,435.04." Although testimony at trial revealed that this was the total amount of debt

21

owed rather than the amount of debt owed on the notes securing the junior mortgage, prospective purchasers were not clear on this fact, and Defendants did nothing to help clarify matters.[8] After those investors testified that their confusion deterred them from placing a bid, Fourteen was able to purchase the property at an uncontested sheriff's sale, with money that Huntington transferred to it at no cost. Then, after Fourteen was able to sell the property to a third party at a roughly 25% markup months later, it immediately transferred the proceeds back to Huntington, again at no cost. The circumstances surrounding this sale are enough to make the Court question whether the sheriff's sale was truly fair.

But those questions are not present when looking at the sale that occurred between Fourteen and G.R. Developments, L.L.C. Unlike the sheriff's sale, where Defendants placed a bid to purchase the property, here, Defendants were only selling the property and, thus, had every incentive to receive the highest price possible. Also unlike the sheriff's sale, where the potential investors were deterred from bidding because of the senior mortgage, here, those investors placed bids conditioned on receiving the Baker Building free and clear of the senior mortgage. And further, unlike the sheriff's sale, any non-responsiveness by Defendants to potential investors' offers can be easily explained: Defendants had received a higher offer

---

[8] Matthew Wilk testified at trial that Defendants would have been happy to sell the property to a third party for $1.8 million, and that if Scott Bosgraaf had asked, Wilk would have told him that the senior mortgage would be discharged if a bid for that amount was placed. (Tr. II at 250.) As the Court noted at trial, however, Wilk's testimony was "especially troublesome" due, not only to what he said, but the manner in which he said it. (Tr. III at 486.) As Plaintiffs have pointed out, there are several discrepancies between what Wilk said at trial and what other witnesses said, as well as between what Wilk said at trial and what he has said on prior occasions. (Pls.' Post-Trial Proposed Findings of Fact and Conclusions of Law 2-3.) Accordingly, the Court gives little weight to Wilk's testimony about what Huntington would have done prior to the sheriff's sale. The Court also notes that John Schandevel, rather than Wilk, was in charge of the Baker Lofts portfolio *after* the sheriff's sale.

from G.R. Developments, L.L.C., which they accepted.

Accordingly, the Court is satisfied that the Baker Building's sale to G.R. Developments, L.L.C., fairly reflects its value. This is further supported by the fact that the sale price is consistent with the more credible expert's testimony.

## 2. The sale price to G.R. Developments, L.L.C. is in line with the more credible expert testimony.

As discussed above, both Plaintiffs and Defendants have presented expert witness testimony in support of their proposed valuations. For several reasons, the Court finds that Defendants' expert, Jeff Genzink, provided the most reliable valuation.

*First*, Genzink used the more appropriate valuation methodology to arrive at his conclusions. Both experts identified the Appraisal Foundation's book (Trial Ex. PP) as an "authoritative source" on the rules of the Uniform Standards of Professional Appraisal Practice (USPAP). (Tr. I at 71.) This book defines the direct capitalization approach as "[a] method used to convert an estimate of a single year's income expectancy into an indication of value in one direct step . . . Only one year's income is used." (Trial Ex. PP. at 504.) This method is "widely used when properties are already operating on a stabilized basis." (*Id.*) Notably, "[t]he direct capitalization methodology may be less useful for properties going through an initial lease-up period and for properties with income or expenses that are expected to change in an irregular pattern over time." (*Id.*) The "discounted cash flow (DCF) analysis," on the other hand, "is a procedure in which a yield rate is applied to a set of income streams and a reversion to determine whether the investment property will produce

23

a required yield given a known acquisition price." (*Id.* at 530.) This is "an appropriate tool for valuing any pattern of regular or irregular income." (*Id.* at 529.)

Plaintiffs' expert Todd Schaal confirmed that "Baker Lofts at July 28, 2011, was not a stabilized property and the market was volatile." (Tr. I at 72.) He confirmed that the "expense and income figures were likely to vary . . . in the future." (*Id.* at 80.) Yet he still used the direct capitalization method, which is "less useful . . . for properties with income or expenses that are expected to change." His explanation for using this method was that many assumptions have to be made in order to use the DCF method, and that there were a "tremendous amount of unknowns" that would make those assumptions difficult. (Tr. I at 84.) But, as explained below, Schaal did not make much of an effort to investigate those "unknowns."

Further, what is particularly perplexing is that Schaal himself utilized the DCF method when valuing the property in 2010 and 2011, and certified that this method produced a credible result. (*See* Trial Exs. G, H.) Schaal offered no credible explanation for his change in methodology. At first, he suggested that Huntington required him to use the DCF method in 2010 and 2011. (Tr. I at 102-03.) He then stated that although the engagement letter did not direct him to use a certain approach, there could have been "a subsequent conversation with Jim McNair of Huntington where we were discussing after we got into the assignment the conditions and if he said, 'I'd like you guys to use a DCF.'" (*Id.* at 103.) He then stated that he could not give a definitive answer. (*Id.* at 104.) Scott Lee, who worked on the 2010

and 2011 reports with Schaal, definitively stated that Huntington did *not* require or suggest a particular approach to valuation. (Tr. III at 573.) He stated that they applied "the most appropriate method that [they] thought was necessary for the property." (*Id.* at 573-74.)

Given the USPAP's instruction that the direct capitalization method is more useful when income and expenses are likely to change, the fact that income and expenses were likely to change in this matter, and the fact that Schaal himself previously affirmed that his use of the DCF method produced a credible result, but provided no credible explanation as to his change in methodology four years later, the Court finds that Genzink's use of the DCF method was more appropriate.

*Second*, the Court finds that Genzink's report was more thorough. Plaintiffs, in arguing that Schaal produced a more credible result, note that Schaal used leases "that were effective as of July 28, 2011" and applied the rent roll given to him "as of July 28, 2011." (Pls.' Post-Trial Proposed Findings of Fact and Conclusions of Law 9.) But in doing so, Schaal failed to consider whether, and for how long, the leases would remain in effect, and did not investigate whether the rent roll was accurate. Schaal did not go through the individual leases himself to compare them with the rent roll that was provided to him by Wardrop (who received it from Bosgraaf). (Tr. I at 76, 85.) He did not account for above- or below-market lease rates, nor did he consider tenants that were delinquent on their rent, that were being evicted, or whose leases were terminating in the near future. (*Id.* at 79-80.) He stated that he did not consider whether the rent roll assumptions provided to him were

reasonable because "[t]hat would have been outside the scope of the work." (*Id.* at 80.) He did, however, compare the rent roll provided to him with market rates, and noted that the two were similar. (*Id.* at 77.) Genzink, on the other hand, personally inspected the leases. He determined that those leases that were above- or below-market were unlikely to continue producing the same income upon their expiration. For those below-market leases, he moved the rental rate up to the market value, and for the above-market leases, he "allowed that contract to go through the term of the lease, and then at the end of that term they would go to the market rate." (Tr. III at 507.) He further took into account the fact that some of the leases were set to expire, and the fact that some of the leases were controlled by Baker Lofts.

### 3. The Court gives little weight to what the investors stated they would have bid at the sheriff's sale.

Plaintiffs place great value on what Jeff Padnos, Dan Dykgraaf, and Jonathan Rooks stated they were prepared to bid at the sheriff's sale. The Court does not.

Jeff Padnos testified that in arriving at his valuation figure, he used numbers provided to him by Bosgraaf. (Tr. I at 22.) He never personally inquired about the first mortgage, never made an effort to determine how much debt was secured by the mortgages, and never even looked at the foreclosure notice. (*Id.* at 34.) Despite valuing the Baker Building at "five to five and a half million," when it came time to actually place a bid for the building, he only bid $1.8 million. (*Id.* at 29; Trial Ex. EE.) After he did not hear back regarding this offer, he made no attempt to follow up with Defendants.

Dan Dykgraaf stated that he valued the property at $10-$12 million, and would have bid up to six million. (Tr. I at 48.) He too relied on figures provided to him by Bosgraaf, and did not personally inspect the leases. (*Id.* at 46.) While he was worried about the senior mortgage prior to the sheriff's sale, when he placed a bid following the sheriff's sale, the bid was conditioned on the senior mortgage being extinguished. Still, his bid valued the Baker Building at $1,881,250. Despite valuing the property at potentially $10 million more than his bid, he too made no efforts to follow up with Huntington.

Jonathan Rooks stated that he believed the property was worth $5,525,000, but admitted that he never completed the due diligence required to feel comfortable making an offer in that amount (Tr. II at 210), that he never did any title work on the property (*id.* at 200), and that he "didn't really work on this project very hard" (*id.* at 207).

The Court finds that Rooks's admissions reflect the other potential investors' positions as well. All of the investors stated that they essentially relied on information given to them by Bosgraaf. When it came time to make bids that would allow them to own the Baker Building free and clear of the senior mortgage, the bids were nowhere near the amount that they stated they valued the property. Even taking into account that they may not have come out of the gate with their highest bid, they made no efforts at all to come back and offer a higher amount, or to check on the status of their bid. It is one thing to, in hindsight, say that they would have bid $5 million. But it is another thing to make a formal offer in that amount, after personally inspecting all of the leases and the property itself, and conducting all of the

necessary due diligence on the property. These investors' actions speak louder than their words, and their actions do not demonstrate that the Baker Building would have, in fact, sold for $5 million at a sheriff's sale.

### 4. The Value of the Baker Building was $2,355,000.

In summary, the Court finds that the fair sheriff's sale value of the Baker Building was $2,355,000. The most important reason supporting this finding is that the Court found no credible evidence indicating that the sale of the Baker Building to G.R. Developments, L.L.C, less than one year after the sheriff's sale, was unfair. Defendants accepted the best offer they received, and had no incentive to shortchange themselves. This value is close to Schaal's initial estimates of the restricted marketing period value of the property in 2010 and 2011 (between $1.8 and $2.2 million), which Genzink stated relied on a reasonable methodology, and which Schaal certified was a credible appraisal at the time of completion. This value is slightly less than Genzink's estimation of the Baker Building's "market value" ($3,080,000), which the Court would expect given that a fair sheriff's sale does not always allow for a "reasonable time . . . for exposure in the open market," nor is there always a buyer and seller who are "typically motivated," as Genzink presumed would be the case when calculating the "market value." (Trial Ex. MM at 13.) And further, this value is in line with what the potential investors actually bid when it came time to place a formal offer (between $1.8 and $2.355 million), rather than what they said they would bid (upwards of $5 million).

Because the Court believes that the fair sheriff's sale value of the Baker Building as

of July 28, 2011, was $2,355,000, and because it is hesitant to say that the sheriff's sale that did occur was necessarily fair, the Court, exercising its equitable powers as it previously did in the June 2014 opinion, finds that $2,355,000, rather than $1,856,250, should have been credited toward the debt Baker Lofts owed to Huntington following the sheriff's sale.

## V. Finding of Fact 2: The Amount of Indebtedness

Throughout this case's three-year history, the amount of indebtedness owed by Baker Lofts to Huntington has not been in dispute. Plaintiffs' first amended complaint, filed in January 2014, states that as of May 8, 2011, the debt included:

    a. A promissory note known as "Loan # 133" which as of the date above had a balance of approximately $2,170,491.87;

    b. A promissory note known as "Loan #141" which as of the date above had a balance of approximately $2,530,524.87; [and]

    c. A promissory note known as "Loan #158" which as of the date above had a balance of approximately $553,418.30[.]

(1st Am. Compl. ¶ 15, ECF No. 56.) The complaint went on to state:

As of May 8, 2011, Loan # 133 was indebtedness owed by Mortgagor Baker Lofts to Mortgagee Huntington and thus, was indebtedness secured by and due under the 2005 Baker Mortgage.

As of May 8, 2011, Loan # 141 was indebtedness owed by Mortgagor Baker Lofts to Mortgagee Huntington and thus, was indebtedness secured by and due under the 2005 Baker Mortgage.

As of May 8, 2011, Loan # 158 was indebtedness owed by Mortgagor Baker Lofts to Mortgagee Huntington and thus, was indebtedness secured by and due under the 2005 Baker Mortgage.

(*Id.* ¶¶ 21, 22, 23.) As late as June 24, 2016, Plaintiffs did not contest the amount of indebtedness. In the Final Pretrial Order, signed by this Court, the parties listed 18 "controverted facts and unresolved issues." (*Id.* at 14-15.) The amount of indebtedness was not included among the contested facts.

The amount of indebtedness was never disputed until July 12, 2016—the second day of trial. (*See* Tr. II at 294.) At that time, Plaintiffs argued that "all along we had believed that this trial was over the debt secured by [Loans] 133, 141, and 158," but that they became suspicious when Loan 158 was not included on Defendants' trial exhibit list. Plaintiffs then reexamined the "admittedly . . . produced" documents (*id.* at 295) and discovered a loan assessment sent in 2010 by Mark Kassab of the Plunkett Cooney law firm who, at the time, was acting as outside counsel to Huntington. (Trial Ex. 73.) The assessment noted "loan document defects." (*Id.* at 5.) Notably, it stated that:

> Trust Certificate dated 12/15/04, signed by Scott T. Bosgraaf and Suzanne L. Bosgraaf, as Trustees of the Scott T. Bosgraaf Trust, states that two (2) of the authorized persons are required to sign agreements to bind the Trust. Most [of] the loan documents executed after 12/15/04 were not signed by Suzanne L. Bosgraaf, as Trustee, but only by Scott.

(*Id.*) Plaintiffs now argue that because Loans 141 and 158 were only signed by Scott Bosgraaf, they are not binding upon the parties, and Plaintiffs do not owe the debt described in those loans. Plaintiffs also note that Loan # 158 binds both Lakewood Two, LLC, and Baker Lofts, LLC as the borrowers.

30

On August 3, 2016, Plaintiffs filed a second amended complaint, which states that "As of July 28, 2011, prior to the sheriff's sale, only a promissory note known as 'Loan #133' remained due and owing from Baker Lofts to Huntington, which as of the date above had a balance of approximately $2,106,311.53 without taking into account credit for Brownfield TIF payments received by Huntington[.]" (2d Am. Compl. ¶ 15.) Defendants filed a motion to strike Plaintiffs' second amended complaint.

### A. This Court did not grant Plaintiffs' motion to amend their complaint at trial.

On August 23, 2016, Plaintiffs filed a response to Defendants' motion to strike Plaintiffs' second amended complaint. Plaintiffs argue that "[i]t was, and still is, Plaintiffs' understanding that this Court granted their oral motion to amend their pleadings to conform to the proofs presented in this case." (Resp. to Mot. to Strike Compl. 2, ECF No. 148.) Plaintiffs state that, at trial, the Court granted their request to amend, and indicated that it would like the amended pleading in writing. Plaintiffs are mistaken. When Plaintiffs moved to amend their pleadings at trial, they asked whether the Court would like them to "brief why we're doing it, but I think the Court is well aware from our discussions over the last two days." (Tr. III at 483.) The Court responded: "In granting your *motion* to conform your pleadings to the proofs you have presented, *I would require that that be as well put in writing* and submitted to this Court later." (*Id.*) (emphasis added). The Court never made an affirmative statement that it was granting a motion to amend the pleadings. Indeed, it stated that it "would require" the motion to be in writing.

**B. Plaintiffs will not be permitted to amend their complaint.**

Federal Rule of Civil Procedure 15 provides:

> If, at trial, a party objects that evidence presented is not within the issues raised in the pleadings, the court *may* permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence will prejudice that party's action or defense on the merits.

Fed. R. Civ. P. 15(b)(1) (emphasis added). The Sixth Circuit has noted, however, that "Rule 15(b) is not a *carte blanche*, allowing parties to amend their pleadings at any time." *Head v. Timken Roller Bearing Co.*, 486 F.2d 870, 874 (6th Cir. 1973). Instead,

> amendments should be tendered no later than the time of pretrial, *unless compelling reasons why this could not have been done are presented*. . . . [A trial judge's] decision must weigh good cause shown for the delay in moving, vis a vis dilatoriness of counsel resulting in last minute surprise and inability of opposing counsel to meet the tendered issue.

*Id.* (citations omitted) (emphasis added). Thus, the "proper analysis" is "to weigh the cause shown for the delay against the resulting prejudice to the opposing party." *Id.*; *see also Jet, Inc. v. Sewage Aeration Sys.*, 165 F. 3d 419, 425 (6th Cir. 1999) ("Abuse of discretion occurs when a district court fails to state the basis for its denial [of a motion to amend] or fails to consider the competing interests of the parties and likelihood of prejudice to the opponent.").

**1. Cause**

The Court is not satisfied that the cause shown for the delay outweighs the resulting prejudice to Defendants that would occur if the Court allowed the amendment. At trial, when Plaintiffs challenged the amount of debt for the first time, the Court explicitly asked, "Why

wasn't this [loan assessment] discovered before?" (Tr. II at 295.) Plaintiffs' counsel stated that he "simply didn't see it. There's no other excuse other than in going through all the documents, I missed it." (Tr. II at 296.) He later stated that the document "had been provided. I had overlooked it. I never saw it before I got down here [for trial]." (*Id.* at 297.)

The Court appreciates the demands that discovery can place upon parties. But the failure to discover a document that had been in Plaintiffs' possession for two years because it was "missed" and "overlooked" is not a "compelling reason" that would justify an amendment to the pleadings during, or three weeks after, the trial. The amount of debt relative to the value of the Baker Building has always been a key issue in this case. Plaintiffs had ample time before the trial to investigate the validity of these loans. Indeed, Scott Bosgraaf, who signed the Trust Certificate setting forth the requirement that both he and Suzanne Bosgraaf are required to sign agreements to bind the Trust, would have been aware of the requirement, and should have known that Loans 141 and 158 are invalid.

## 2. Prejudice

The Court also notes that allowing an amendment at this stage would prejudice Defendants. This prejudice is apparent. In order to respond to Plaintiffs' newly-raised argument that Loans 141 and 158 are invalid, Defendants attached new exhibits to their proposed findings of fact and conclusions of law on August 3, 2016. (Exs. 2-4 to Defs.' Post-Trial Proposed Findings of Fact and Conclusions of Law, ECF No. 143.) Plaintiffs' immediately responded in bold-print alleging that "Huntington and its attorneys are

33

improperly attempting to slip UNAUTHENTICATED, INACCURATE, and IRRELEVANT documents in after trial has been concluded. Huntington's actions are ABSOLUTELY INAPPROPRIATE and are SANCTIONABLE."[9] (Pls.' Post-Trial Proposed Findings of Fact and Conclusions of Law 1.) (emphasis in original). But these documents had to have been provided after trial, because the argument was first raised at trial. It would have been impossible for Defendants to, before the trial, provide authenticated information in response to an argument raised during trial. Defendants were not able to conduct any of their own discovery on the issue, or to provide briefing, because the validity of these loans had been admitted in Plaintiffs' first amended complaint.

Plaintiffs also state that Defendants should not have been surprised that Plaintiffs were challenging the debt. (Resp. to Mot. to Strike 4.) The Court disagrees. It too was surprised that Plaintiffs were challenging the debt on the second day of trial, given Plaintiffs' admissions in the first amended complaint that the notes were "owed by Mortgagor Baker Lofts to Mortgagee Huntington and thus, [were] indebtedness secured by and due under the 2005 Baker Mortgage," as well as Plaintiffs' failure to challenge the debt in any of the numerous motions for summary judgment that they had filed.

Moreover, the Court notes that Plaintiffs discovered this evidence the week before trial, yet did not inform the Court or Defendants that they intended to amend the pleadings until the second day of trial. Perhaps, with even a weekend's notice, Defendants could have

---

[9] The Court has not relied on Defendants' newly-offered exhibits in arriving at its conclusions, but mentions this solely to demonstrate the prejudice that would result.

produced exhibits in response to this proposed amendment at trial, but they were not given the opportunity to do so.

Plaintiffs ask that this Court allow an amendment at the last minute (or, after the last minute) so that they can retract their statements that the notes were enforceable, but they also ask the Court to prevent Defendants from challenging this new claim, and sanction them for attempting to do so. For the reasons stated, the Court finds that the cause shown for Plaintiffs' delay is outweighed by the prejudice that would result to Defendants. *See Head*, 486 F.2d at 874 (noting that prejudice may result if a party would be "required to offer evidence much different from that which it would be expected to offer against the plaintiffs' other claims"). Accordingly, Plaintiffs will not be allowed to amend their complaint.

### C. Indebtedness Calculation

As noted, Plaintiffs' first amended complaint states that Loans 133, 141, and 158 were "indebtedness owed by Mortgagor Baker Lofts to Mortgagee Huntington and thus, [were] indebtedness secured by and due under the 2005 Mortgage." (First Am. Compl. ¶¶ 21, 22, 23.) "'Factual assertions in pleadings . . . , unless amended, are considered judicial admissions conclusively binding on the party who made them.'" *Kay v. Minacs Grp. (USA), Inc.*, 580 F. App'x 327, 331 (6th Cir. 2014) (citation omitted); *see also Ferguson v. Neighborhood Housing Servs. of Cleveland, Inc.*, 780 F.2d 549, 551 (6th Cir. 1986) (noting that "under federal law stipulations and admissions in the pleadings are generally binding on the parties and the Court," and the "admission should not be reopened in the absence of a

showing of exceptional circumstances"). To qualify as a judicial admission, the statement must be "deliberate, clear, and unambiguous." *MacDonald v. General Motors Corp.*, 110 F.3d 337, 340 (6th Cir. 1997). The Court finds Plaintiffs' statements in their first amended complaint deliberately, clearly, and unambiguously admitted that Loans 133, 141, and 158 were "indebtedness owed" by Baker Lofts to Huntington at the time of the sheriff's sale. The Court does not find that exceptional circumstances warrant reopening this admission this late in the game.

## 1.  Loan 133

As the first amended complaint states, Loan # 133 is enforceable debt owed by Baker Lofts to Huntington. The principal amount of debt owed on this note was $2,457,364.00. (Trial Ex. F.) After taking into account payments and credit made on this Loan, as well as interest that had accrued prior to the date of the sheriff's sale, Baker Lofts owed $2,106,311.53 on this note as of July 28, 2011. (*See* Trial Ex. 36.)

## 2.  Loan 141

The first amended complaint states that Loan # 141 is enforceable debt owed by Baker Lofts to Huntington. The principal amount of debt owed on this note was $2,675,000.00. (Trial Ex. E.) After taking into account payments and credit made on this Loan, as well as interest that had accrued prior to the date of the sheriff's sale, Baker Lofts owed $2,530,524.87 on this note as of July 28, 2011. (Trial Ex. 37.)

### 3.  Loan 158

The first amended complaint states that Loan # 158 is enforceable debt owed by Baker

Lofts to Huntington. The principal amount of debt owed on this note was $695,190.00. (Trial

Ex. LLL.) After taking into account payments and credit made on this Loan, as well as

interest that had accrued prior to the date of the sheriff's sale, Baker Lofts owed $548,356.66

on this note as of July 28, 2011. (Trial Ex. 38.)

### 4.  Application of TIF Payments

Plaintiffs also note that Brownfield TIF payments made from the City of Holland to

Defendants prior to the sheriff's sale were required to be applied to Baker Lofts' debt. (Trial

Ex. 29 at 2.) At trial, Matthew Wilk testified that, other than payments listed on the loan

history sheets (Exs. 31, 36, 37, 38), there were no other credits toward Baker Lofts' debt. (Tr.

II at 308.) He also stated, however, that the sheets only show TIF payments that were applied

to the principal of Baker Lofts' debt. "It's not going to show you interest payments." (*Id.* at

308-09.)

Plaintiffs presented evidence demonstrating that, prior to July 28, 2011, Defendants

received $583,435.28 in TIF payments from the City of Holland. (Trial Ex. 31 at 1-12.) The

loan history sheets for Loans 133 and 141 do not show that any TIF payments were credited

against the debt. (*Compare* Payments in Trial Ex. 31, *with* Ledger in Trial Exs. 36 and 37.)

The loan history sheet for Loan 158, however, shows that a TIF payment of $5,732.42, paid

to Huntington on May 27, 2010 (Trial Ex. 31 at 10) was credited toward Baker Lofts' debt

owing on Note 158 on June 11, 2010 (Trial Ex. 38 at 5). Further a TIF payment of $5,059.64, paid to Huntington on May 26, 2011 (Trial Ex. 31 at 12), was credited toward Baker Lofts' debt owing on Note 158 on June 2, 2011 (Trial Ex. 38 at 6). Although Matthew Wilk testified that if he had the tickets for each TIF payment, he would have been able to track down where those payments were applied to, there was no other evidence presented indicating that these TIF payments were credited against Baker Lofts' debt. Accordingly, the Court finds that an additional $572,643.22[10] should have been credited toward Baker Lofts' debt.

### 5.   The Amount of Indebtedness is $4,612,549.84.

After subtracting the Brownfield TIF payments that should have been credited toward Plaintiffs' debt from the sum of Loans 133, 141, and 158 as of July 28, 2011, the Court finds that, as of July 28, 2011, Baker Lofts remained indebted to Huntington in the amount of $4,612,549.84.

### D. Even if the Court allowed Plaintiffs to amend their complaint, or found exceptional circumstances existed and relieved Plaintiffs of their judicial admissions, the debt owed would still be greater than the value of the Baker Building.

As an additional reason for denying Plaintiffs leave to amend their complaint, the Court notes that such an amendment would be futile because Baker Lofts would still be indebted to Huntington in the same amount.

---

[10] $583,435.28-$5,732.42-$5,059.64

### 1.  Unjust Enrichment

First, Plaintiffs would still be indebted to Huntington based on a theory of unjust enrichment. Michigan law defines "unjust enrichment" as "the unjust retention of 'money or benefits which in justice and equity belong to another.'" *Tkachik v. Mandeville*, 790 N.W.2d 260, 266 (Mich. 2010) (quoting *McCreary v. Shields*, 52 N.W.2d 853, 855 (Mich. 1952)).

Plaintiffs, in essence, argue that no contract existed requiring Baker Lofts to pay back Huntington on Notes 141 and 158 because Suzanne Bosgraaf's signature was missing. But "[e]ven though no contract may exist between two parties, under the equitable doctrine of unjust enrichment, '[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other.'"*Kammer Asphalt Paving Co., Inc. v. East China Twp. Schs.*, 504 N.W.2d 635, 640 (Mich. 1993) (quoting Restatement (First) of Restitution § 1, p. 12 (1937)). An action for unjust enrichment may be brought "'whenever a person, natural or artificial, has in his or its possession money which in equity and good conscience belongs to [the other party]." *Mich. Educ. Employees Mut. Ins. Co. v. Morris*, 596 N.W.2d 142, 151 (Mich. 1999). "The remedy is one by which 'the law sometimes indulges in the fiction of a quasi or constructive contract, with an implied obligation to pay to pay for the benefits received' to ensure that 'exact justice' is obtained." *Kammer Asphalt*, 504 N.W.2d at 640 (quoting *Detroit v. Highland Park*, 39 N.W.2d 325, 334 (Mich. 1949)).

It is undisputed that Loan 133 is enforceable debt owed by Baker Lofts to Huntington, and the Court has found that the amount of debt owed on this note as of July 28, 2011, was $2,106,311.53. *See* discussion *supra* Section V.C.1.

At trial, Scott Bosgraaf also admitted that Baker Lofts received the debt described in Loan 141, and did not repay that debt. (Tr. III at 444, 462-63, ECF No. 137.) The Court has found that the amount of debt owed on this note as of July 28, 2011, was $2,530,524.87. *See* discussion *supra* V.C.2. Essentially, Plaintiffs ask this Court to find that, although Baker Lofts received $2,675,000 from Huntington, spent that money, and was still indebted in the amount of $2,530,524.87, it had no obligation to ever pay Huntington because the loan documents were missing a signature. Finding this debt unenforceable would result in the unjust retention of money that belongs to Huntington. *Tkachik*, 790 N.W.2d at 266; *see also Pro Bono Inv., Inc. v. Gerry*, No. 03Civ.0347, 2005 WL 2429777, at *9 (S.D.N.Y. Sept. 30, 2005) ("[If] funds were paid . . . without consideration and never repaid, the plaintiff may have a valid claim of unjust enrichment. Indeed, if [the defendant] really borrowed money but failed to repay the loan, then those funds should arguably be returned even though the Note itself fails."). Accordingly, under a theory of unjust enrichment, Baker Lofts would still be "'obligat[ed] to pay for the benefits received'" under this note. *Kammer Asphalt*, 504 N.W.2d at 640 (quoting *Highland Park*, 39 N.W.2d at 334).

Based on these two notes, the Court can comfortably say that the starting point for the debt calculation is at least $4,636,836.40. Then, there is Loan 158. The Court has found that

the amount of debt owed on this note as of July 28, 2011, was $548,356.66. *See* discussion *supra* Section V.C.3. Plaintiffs, for the first time at trial, argued that this note is not enforceable against Baker Lofts because Baker Lofts never received the proceeds from this note, but only guaranteed the debt for Lakewood Two, LLC, which actually received the funds. (Tr. III at 443.) Scott Bosgraaf also vaguely testified that this note may have been repaid. (*Id.* at 462-63.) Regardless of the fact that Lakewood Two, LLC, may have received the funds, the note states that "Lakewood Two, LLC . . . *and Baker Lofts LLC* . . . hereby promise to pay to the order of the Huntington National Bank . . . in lawful currency . . . and in immediately available funds, according to the terms set forth in this Note, the principal sum of . . . $695,190.00[.]" (Trial Ex. LLL.) Despite Bosgraaf's testimony that he did not know where the money obtained from his assets that were sold went, and that that money "could have repaid [this] note," the best evidence in front of the Court—the loan history sheet for Loan 158—indicates that the note was not repaid as of July 28, 2011. (Trial Ex. 38.) Accordingly, because Huntington disbursed $695,190, and because Baker Lofts promised to pay this debt but did not, the Court finds that this debt is enforceable under a theory of unjust enrichment as well.[11]

After subtracting the Brownfield TIF payments that should have been credited toward the debt from the sum of the debt outstanding on Loans 133, 141, and 158, the amount of

---

[11] The Court notes that even if it found that the debt on Loan 158 was unenforceable, the value of the Baker Building would still be less than the amount of indebtedness owed by Baker Lofts to Huntington.

indebtedness as of July 28, 2011—even after allowing Plaintiffs to amend their complaint—would have been $4,612,549.84.

## 2. Quantum Meruit

The Court would have come to the same conclusion based on a theory of quantum meruit. Again, Plaintiffs' premise for their argument that Loans 141 and 158 were unenforceable is that no valid contract existed binding Baker Lofts due to the lack of Suzanne Bosgraaf's signature. At trial, Plaintiffs suggested that the lack of signature violates the statute of frauds. (Tr. II at 289-90.) But Michigan courts allow for recovery in circumstances such as this. Recovery is permissible "on a quantum meruit theory where the plaintiff has performed services under an express agreement which is not enforceable because of the statute of frauds or some other statute that prevents recovery on the terms of the agreement itself." *Geistert v. Scheffler*, 25 N.W.2d 241, 243 (Mich. 1946). To recover on a theory of quantum meruit, the factfinder must "first determine: (1) That the contract alleged by plaintiff actually was made; and (2) that the terms were such as are alleged, and (3) that the contract has been fully executed by one party and the other has received the benefits." *Ordon v. Johnson*, 77 N.W.2d 377, 383 (Mich. 1956) (citing *Winchester v. Brown*, 250 N.W. 277 (Mich. 1933)).

Here, there is no dispute that the agreements in Loans 141 and 158 were actually made; Plaintiffs' only argument for unenforceability is a technical one, based on the lack of a signature. Also, there is no dispute that the terms were any different than the notes indicate.

42

Moreover, there is no dispute that the contract was fully executed by Huntington, who disbursed the funds, and that Baker Lofts and Scott Bosgraaf received the benefits. Accordingly, on a theory of quantum meruit, too, Loans 141 and 158 were still enforceable.

## VI. The Value of the Brownfield TIF

Following the sheriff's sale, Baker Lofts was still indebted to Huntington in the amount of $2,257,549.84. In an attempt to collect on the remaining indebtedness, Huntington published a "notification of public disposition," informing the public of a public auction that would be held on the TIF rights. Notice of the auction was also published in the Holland Sentinel and the Detroit Legal News. Baker Lofts, Bosgraaf, and other entities were also informed of the sale. The auction was held, and Huntington was the only bidder. The TIF rights were purchased by Huntington with a credit bid of $1,107,000.

Plaintiffs contend that the TIF rights were worth $1,954,928.25. But Plaintiffs presented no evidence showing that the sale of the TIF rights itself was unfair. Indeed, at trial, Plaintiffs stipulated that Huntington "followed the statutory and any other requirements that were necessary to sell the TIF with the caveat that if we establish there was no debt or not enough debt, we won't challenge the procedural aspects of the sale." (Tr. IV at 650.) A fair sale was held that resulted in a bid of $1,107,000. Accordingly, the Court finds that the value of the Brownfield TIF was $1,107,000.

## VII. Conclusions of Law

### A. Plaintiffs' claims are meritless.

All of Plaintiffs' claims relied on a finding that, as of July 28, 2011, the value of the Baker Building was greater than the amount of indebtedness owed by Baker Lofts to Huntington. The Court has found that the value of the Baker Building ($2,355,000) was less than the amount of indebtedness owed to Huntington ($4,612,549.84). Accordingly, the sheriff's sale of the Baker Building did not result in the extinguishment of Baker Lofts' remaining debt. *See Torres*, 2014 WL 309787, at *8; *DAGS II*, 616 F. App'x 830, 840-41.

Because Baker Lofts was still indebted to Huntington in the amount of $2,257,549.94 following the sheriff's sale, Huntington was entitled to foreclose on the additional collateral, including the Brownfield TIF and the liquor license. Plaintiffs' claims of conversion fail because Huntington was not "wrongfully exert[ing] dominion over" the Brownfield TIF or rents. (Am. Compl. ¶¶ 87, 91.) Plaintiffs' claim of "replevin/claim of delivery" fails because Plaintiffs were not "rightfully entitled to beneficial possession and enjoyment of the Brownfield TIF." (*Id.* ¶ 94.) Plaintiffs' claim of tortious interference fails because Huntington did not "intentionally and improperly interfere[]" with the Brownfield TIF agreement "even though Baker Lofts [was] no longer indebted to Huntington." (*Id.* ¶¶ 102, 103.) And Plaintiffs' claim of a violation of Michigan's Secured Transactions statute fails because the Brownfield TIF was not sold "when Baker Lofts was neither indebted to

Huntington nor was in default." (*Id.* ¶ 111.) Rather, Baker Lofts was indebted to Huntington and was in default.

## B. Defendants' Counterclaim

Defendants have raised a counterclaim asserting that G2BK, LLC, recently sold the liquor license that Defendants possess a security interest in, and that Defendants are entitled to the proceeds from that sale. Following the sale of the Brownfield TIF, Baker Lofts was still indebted to Defendants in an amount greater than $1 million. The Court has not been able to locate any evidence in the record which shows how much the liquor license was sold for, but all indications are that it was sold for substantially less than the amount that Huntington is still owed. (*See* Tr. III at 552 (discussing $25,000 bid for the liquor license).) The Court, based on that presumption, finds that Huntington is entitled to the full proceeds of G2BK's sale of the liquor license.

An order and judgment will enter consistent with this opinion.


Dated: <u>August 31, 2016</u>                    <u>/s/ Robert Holmes Bell</u>
                                              ROBERT HOLMES BELL
                                              UNITED STATES DISTRICT JUDGE